IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THUC TRAN,                          )
                                    )
                  Plaintiff,        )
                                    )
vs.                                 )          Case No. CIV-10-69-C
                                    )
SONIC INDUSTRIES                    )
SERVICES, INC.,                     )
                                    )
                  Defendant.        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Thuc Tran ("Tran") brought suit against Defendant Sonic Industries Services, Inc. ("Sonic"), claiming race, national origin, and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981, seeking compensatory and punitive damages. Defendant filed the present Motion for Summary Judgment arguing that Plaintiff's claims fail as a matter of law.

## I.  BACKGROUND

From May 2003 to July 2009, Plaintiff, a Vietnamese female, worked for Defendant Sonic in its marketing department as a director and research analyst. (Pl.'s Am. Compl., Dkt. No. 5, at 1; Def.'s Br., Dkt. No. 81 Ex. 1.)  In June 2007, the marketing department underwent restructuring and personnel changes to adapt to the changing economic climate. (Def.'s Br., Dkt. No. 71, at 3.)  During this time, Todd Townsend, chief marketing officer, selected Matt Schein as the new director of marketing and strategy planning. (Id. at 4-5.) This promotional process occurred without Mr. Townsend formally posting the position or conducting interviews, neither of which are required under Sonic policy. (Id. at 4.)

In August of 2008, Mr. Townsend resigned from Sonic and Paul Macaluso replaced him as chief marketing officer. (Id. at 6.) This replacement caused a vacancy in Mr. Macaluso's prior position as vice president of product development, product marketing, and promotional calender. Again, Defendant did not give notice of this opening, did not conduct interviews, and did not produce documentation, beyond that prepared for litigation, outlining the required qualifications for this position. (See id. at 7; Pl.'s Br., Dkt. No. 97, at 2.) Mr. Macaluso transferred Mr. Schein, formerly the director of marketing strategy and planning, into Mr. Macaluso's now vacant position of vice president. (Def.'s Br., Dkt. No. 71, at 7.) Mr. Macaluso then filled Mr. Schein's vacant position, director of marketing strategy and planning, with Trey Taylor. (Id. at 9.) Defendant claims that Mr. Schein's previous position was "reconfigured" and renamed director of marketplace and consumer insights. (Id. at 8.)

On September 1, 2008, Mr. Taylor, who was formerly Plaintiff's peer and coworker, became her direct supervisor. (Id. at 9.) Defendant claims that Plaintiff's attitude immediately indicated her belief that Mr. Taylor was not qualified to be her superior. (Id. at 10.) In October 2008, Plaintiff's former supervisor, Mr. Schein, delivered a performance review of Plaintiff's work through August of 2008, which gave her a "Premi-Yum" rating. (Id. at 10.) Premi-Yum in Sonic evaluation standards means "[c]onsistently generates results above those expected in the key points of the position. Few improvements needed." (Pl.'s Br., Dkt. No. 97 Ex. 12, at 1.) Plaintiff, Plaintiff's former supervisor, Mr. Schein, and Plaintiff's then supervisor, Mr. Taylor, attended the meeting where Plaintiff's performance review was discussed. (Def.'s Br., Dkt. No. 71, at 10.)

On November 7, 2008, the "Insights" team—Plaintiff, Mr. Taylor, Mr. Macaluso, and Reed Reutlinger—attended a meeting with upper management, specifically the chief executive officer ("CEO"), Cliff Hudson, and the president, Scott McLain, to discuss the team's role within the brand. (<u>Id.</u> at 10-11.) During this meeting, after a presentation by Mr. Macaluso and Mr. Taylor, Mr. Hudson posed a question regarding segmentation of customers and research. After Mr. Taylor and Mr. Macaluso responded to this question, Plaintiff interjected with an opinion at odds with Mr. Taylor and Mr. Macaluso's opinion. While communicating her opinion, Plaintiff spoke loudly and quickly without giving those listening an opportunity to speak or ask questions, which caused frustration among the audience, specifically the CEO. (<u>Id.</u>)

The next day, Mr. Macaluso addressed Plaintiff's conduct during this meeting in an e-mail to Mr. Hudson. (<u>Id.</u> at 12) (stating that "[Mr. Macaluso] would be remiss if [he] didn't mention that Trey and [he] ha[d] already connected about what [they] thought was ineffective interaction on the part Thuc"). On November 12, Mr. Taylor and Mr. Macaluso met with Plaintiff to discuss her perspective on the meeting and the effectiveness of her communication. (<u>Id.</u>) Defendant claims that Mr. Taylor counseled Plaintiff on more effective means of communicating, but Plaintiff claims that Mr. Taylor simply instructed her not to speak at future meetings with upper management unless asked a question. (<u>Id.</u> Ex. 14; Pl.'s Br., Dkt. No. 97 Ex. 3, at 116-17.)

After the meeting, Defendant asserts that Plaintiff continued to resist Mr. Taylor's role as her supervisor and that Mr. Taylor attempted to breach this disconnect by writing a memo, entitled "My Hope," to Plaintiff. (Def.'s Br., Dkt. No. 71, at 13.) Plaintiff states that during the interim period between the meeting with upper management and the "My Hope" memo, no infraction occurred requiring such counseling. (Pl.'s Br., Dkt. No. 97, at 4.) In the "My Hope" memo, Mr. Taylor enumerated Plaintiff's strengths, but questioned Plaintiff's commitment to the department and her level of respect towards her superiors and peers. (Def.'s Br., Dkt. No. 71 Ex. 15.) Mr. Taylor also listed "opportunities" where Plaintiff could improve her performance, including "interaction" with upper management. (Id.)

On January 15, 2009, Mr. Taylor presented a "Performance Improvement Plan" ("PIP") to Plaintiff detailing ways Plaintiff needed to improve her work performance. (Id. at 13.) Plaintiff denies that this PIP was warranted and claims that Mr. Taylor's failure to provide specific instances of bad conduct substantiate her belief. (Pl.'s Br., Dkt. No. 97, at 4.) When he presented this plan to Plaintiff, Mr. Taylor met with Plaintiff for an hour during which they discussed the plan. At the end of this meeting, Plaintiff signed the plan indicating that she understood its contents. (Def.'s Br., Dkt. No. 71, at 13.) Plaintiff asserts that the plan was too vague and the "improvements" indicated too subjective for her to understand and apply. (Pl.'s Br., Dkt. No. 97, at 5, 17.) After receiving her PIP, Plaintiff asked several coworkers if they understood what action needed to be taken; Defendant states that Plaintiff had the opportunity to question Mr. Taylor during the hour-long meeting and that Mr. Taylor would have answered Plaintiff's questions, but that Plaintiff did not use this opportunity.

(Def.'s Br., Dkt. No. 71, at 14.) Plaintiff claims that she generally asked Mr. Taylor, "[c]an you show me these things," referencing conduct that needed improvement, but that Mr. Taylor did not provide an adequate response. (Pl.'s Br., Dkt. No. 97, at 5.) During this period, another marketing department employee, the director of merchandise and segment marketing, was also placed on a PIP. (Def.'s Br., Dkt. No. 71, at 14.)

During the months of January and February of 2009, Plaintiff participated in a 360 Leadership Inventory where an outside consultant, Tina DeSalvo, conducted a review to identify, through peer and supervisor assessments, "blind spots" in participants' performances. (Id.) The results were mixed: Plaintiff received low ratings from managers, her superiors, but higher levels from her peers. (Id.; Pl.'s Br., Dkt. No. 97, at 6.) Plaintiff asserts that Mr. Taylor shared his opinions of Plaintiff's performance with other managers during manager meetings which caused them to give Plaintiff lower ratings. (Pl.'s Br., Dkt. No. 97, at 6.)

In June of 2009, vice president Dominic Losacco replaced Mr. Macaluso as head of the marketing department. (Def.'s Br., Dkt. No. 71, at 15.) On June 25, Defendant claims that Plaintiff failed to properly and timely prepare a report for Mr. Taylor, which became the tipping point in the decision to terminate Plaintiff. (Id. at 16-17.) Mr. Taylor used reports prepared by Plaintiff to present information to upper management. (Id.) On this particular occasion, Plaintiff delivered the lengthy report mid-afternoon the day before the meeting with upper management, which Defendant asserts did not leave enough time for him to properly prepare. Plaintiff received this data on June 12, but did not present her report for another two

weeks; Plaintiff apologized for the lateness of the report in an e-mail to Mr. Taylor. (Id. Ex. 23 ("I am sorry for the delay in getting the May '09 promo tracker report.").) Plaintiff claims that, despite this exchange, she timely filed the report and that Mr. Taylor simply used this occasion as an excuse to terminate her. (Pl.'s Br., Dkt. No. 97, at 7.)

The Saturday following the June 26 meeting with upper management, Mr. Taylor discussed with Mr. Losacco the length of time Plaintiff had been on her PIP and that she had not shown signs of improvement, which ultimately led to Plaintiff's termination in July 2009. (Def.'s Br., Dkt. No. 71, at 17.) Mr. Taylor provided documentation to Defendant's human resources department outlining the reasons for Plaintiff's termination citing general issues with Plaintiff's performance, but not a comprehensive description of all alleged infractions. (Id.; Pl.'s Br., Dkt. No. 97, at 8.) A comprehensive description of Plaintiff's shortcomings was not prepared until after litigation had begun. (Def.'s Br., Dkt. No. 71, at 18.) Plaintiff's last day of work was July 10, 2009, and ten days later, on July 20, Plaintiff filed a charge of discrimination with the EEOC. (Def.'s Br., Dkt. No. 71, at 18-19.) While Mr. Taylor recommended a Caucasian female, Kim Soulek, to replace Plaintiff, Plaintiff's duties were absorbed by employees within the department. (Id.)

## II. STANDARD OF REVIEW

Summary judgment is proper if the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Under the summary judgment standard, a mere factual dispute will not preclude summary judgment; instead there must be a genuine issue of material fact."

Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000). The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation omitted). A fact is material if it affects the disposition of the substantive claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 247 (1986). A court considering a summary judgment motion must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).

If a party does not sufficiently support its own asserted facts or address the other party's asserted fact, a court may allow "opportunity to properly support or address the fact . . . consider the fact undisputed for purposes of the motion . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . or issue any other appropriate order." Fed. R. Civ. P. 56(e).

### III.  DISCUSSION

Plaintiff asserts racial, gender, and national origin discrimination claims under Title VII and 42 U.S.C. § 1981 against Defendant Sonic. Defendant claims that both failure-to-promote claims asserted under Title VII fail because Plaintiff's EEOC filing exceeded the maximum 300-day limit under 42 U.S.C. § 2000e-5(e) and (f). Plaintiff, in her response to

Defendant's Motion for Summary Judgment, dropped altogether her first failure-to-promote claim involving the promotion of Mr. Schein in August 2007. (Pl.'s Br., Dkt. No. 97, at 2.) However, Plaintiff did not do the same for her second failure-to-promote claim, involving the promotion of Mr. Taylor in September 2008. Accordingly, only the second failure-to-promote claim will be addressed.

## A. Title VII Claims

Under Title VII, a plaintiff must exhaust administrative remedies prior to initiating a discrimination suit. Specifically, a plaintiff must file her claim with the EEOC within 300 days[1] of the alleged unlawful act, and failure to do so precludes that plaintiff from bringing suit in court under Title VII for that act. EEOC v. W.H. Braum, Inc., 347 F.3d 1192, 1196 (10th Cir. 2003); Davidson v. Am. Online, Inc., 337 F.3d 1179, 1183 & n.1 (10th Cir. 2003). A plaintiff must satisfy these requirements as to each discrete incident of alleged wrongful employment practice. Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003). Administrative exhaustion is a subject matter jurisdictional prerequisite to suing under Title VII, "not merely a condition precedent to suit." Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005); Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996). "[B]ecause failure to exhaust administrative remedies is a bar to subject matter jurisdiction, the burden is on the plaintiff as the party seeking federal jurisdiction to show, by competent

---

[1] Oklahoma is a "deferral state," which means that a state agency has authority to investigate employment discrimination; Title VII requires claimants to file a charge of discrimination within 300 days of the alleged unlawful employment practice. 25 Okla. Stat. § 1502; 42 U.S.C. § 2000e-5(e)(1).

evidence, that she did exhaust." <u>McBride v. CITGO Petroleum Corp.</u>, 281 F.3d 1099, 1106 (10th Cir. 2002). Once it is shown that a plaintiff has filed the required charge, the issue of whether that charge was <u>timely</u> filed becomes an affirmative defense rather than a jurisdictional bar. <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 393 (1982). Accordingly, when the issue is whether the plaintiff timely filed a charge with the EEOC, the burden is on the defendant to show that the charge was not filed timely.

Defendant claims that Plaintiff failed to satisfy the 300-day limit for filing a claim with the EEOC. (Def.'s Br., Dkt. No. 71, at 20) ("In this case, Plaintiff's charge of discrimination was filed in July 2009—more than 300 days after both the August 2007 promotion of Matt Schein and the September 2008 promotion of Trey Taylor (Fact 41)."). Defendant Sonic promoted Mr. Taylor to director of marketplace and consumer insights on September 1, 2008. (Def.'s Br., Dkt. No. 103 Ex. 3, at 7.) Plaintiff filed her charge of discrimination with the EEOC on July 20, 2009, making the total number of days between the discrete action and the filing of the EEOC charge 323 days. Because Plaintiff failed to timely filed her charge, Defendant is entitled to summary judgment as to Plaintiff's failure-to-promote Title VII claims.

### B. Plaintiff's Remaining Claims

While the elements of a discrimination lawsuit are the same whether it is brought under § 1981 or Title VII, only Title VII claims are barred by failing to timely file a charge of discrimination. <u>Baca v. Sklar</u>, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005). Accordingly,

Plaintiff's failure-to-promote claim under § 1981 and remaining discrimination claims are not barred by failing to timely file a charge and, therefore, must still be addressed.

When a plaintiff does not have direct evidence of discrimination, courts utilize the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a prima facie case of unlawful discrimination. "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" Kendrick, 220 F.3d at 1227 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981)); Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1146 (10th Cir. 2008) (describing the prima facie elements of discrimination as "neither rigid nor mechanistic"); Barone v. United Airlines, Inc., 355 F. App'x 169, 180 (10th Cir. 2009) ("We emphasize that the burden of establishing a prima facie case is 'not onerous.'");. Once the plaintiff has established the prima facie case, the burden shifts to the employer to establish legitimate, nondiscriminatory reasons for the action taken. If the employer satisfies this standard, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination. Johnson v. Weld Cnty., Colo., 594 F.3d 1202, 1211 (10th Cir. 2010).

Pretext is established by showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer

that the employer did not act for the asserted non-discriminatory reasons." Jones v. Okla. City Pub. Sch., 617 F.3d 1273, 1280 (10th Cir. 2010) (quoting Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005)). It is not the courts' role to determine whether an employer's decision was "'wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [given] and acted in good faith upon those beliefs.'" Rivera v. City & Cnty. of Denver, 365 F.3d 912, 925 (10th Cir. 2004) (first alteration in original) (quoting Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)).

### 1. Failure to Promote

To establish a prima facie case of discrimination resulting in a failure to promote, a plaintiff must show four elements: (1) that she was a member of a protected class; (2) that she sought and was qualified for a position; (3) that she did not receive the position; and (4) that the position remained open or was filled with a nonminority. MacKenzie v. City & Cnty. of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005); Amro v. Boeing Co., 232 F.3d 790, 796-97 (10th Cir. 2000). For summary judgment purposes, Defendant does not contest that Plaintiff satisfies the prima facie elements of the 2008 promotion decision, (Def.'s Br., Dkt. No. 71, at 21), and the Court concludes that Plaintiff has sufficiently established the prima facie case to carry forward with the burden-shifting analysis.

Defendant claims that it has proffered sufficient legitimate, nondiscriminatory reasons for promoting Mr. Taylor which Plaintiff cannot establish were pretextual. Specifically, the decisionmaker, Mr. Macaluso, who had previously worked with both Mr. Taylor and

Plaintiff, "looked over the current staffing of the existing Marketing Department to determine who would be best suited to fill the newly-reconfigured . . . position." (Def.'s Br., Dkt. No. 71, at 8.) When making this decision, Defendant claims that Mr. Macaluso was looking for someone who would bring a new perspective, provide new focus on consumers' perspectives, implement new directions with senior management, and effectively lead. (Id.) Defendant also states this decision was made in the context of restructuring the department and determining which jobs could be removed or combined with others. (Id. at 7-8.) Defendant has sufficiently offered legitimate, nondiscriminatory reasons for the promotion to shift the burden to Plaintiff to establish these reasons were a pretext for unlawful discrimination.

Plaintiff claims she has established these legitimate, nondiscriminatory reasons are pretextual by showing that she had greater service to Sonic than Mr. Taylor, received higher performance reviews than Mr. Taylor, and was more experienced in critical areas than Mr. Taylor. (Pl.'s Br., Dkt. No. 97, at 27.) Additionally, Plaintiff claims that Defendant has no documentation of the promotional process and, therefore, the only evidence is oral testimony which a jury could choose to discredit. Plaintiff also complains of the procedure used to promote Mr. Taylor—Defendant did not post the position, conduct interviews for the position, or keep records of the decision-making process. Plaintiff argues that post hoc explanations of the promotion should not be given credence and that a jury could draw an inference of discrimination from such explanations.

Plaintiff relies on Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1218 (10th Cir. 2002), as support for finding pretext shown due to the wholly subjective nature of the

selection process. In <u>Garrett</u>, the Tenth Circuit upheld the district court's finding that the plaintiff had established pretext in part because the defendant's evaluation and ranking system was wholly subjective. <u>Id.</u> Unlike the present case, however, <u>Garrett</u>, and the cases cited as support in that opinion, use subjectivity of a decision was one factor, not the exclusive factor to establish that the employer's legitimate, nondiscriminatory reasons were pretextual. <u>Id.</u> at 1217 ("Our review of the record reflects ample evidence of inconsistent treatment of plaintiff, disturbing procedural irregularities, <u>and</u> the use of subjective criteria." (emphasis added)); <u>see, e.g.</u>, <u>Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1328 (10th Cir. 1999). The same is true in <u>Paup v. Gear Prods., Inc.</u>, 327 F. App'x 100, 111-12 (10th Cir. 2009), which Plaintiff cites as support for finding pretext due to Defendant's "post hoc" explanation of the selection process. <u>See id.</u> ("But there remain several reasons, <u>taken together</u>, why a reasonable jury might discredit Gear Products's [sic] proffered explanations.").

Plaintiff's belief that her employer "got it wrong" is not enough "to suggest something more nefarious might be at play." <u>Johnson</u>, 594 F.3d at 1211. To establish pretext, a plaintiff must produce evidence that the employer did more than get it wrong.

> [S]he must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda. This is because Title VII licenses [courts] not to act as a "super personnel department" to undo bad employment decisions; instead, it charges us to serve as a vital means for redressing discriminatory ones.

<u>Id.</u> Plaintiff has not established that she is uniquely disadvantaged by any procedural defects, if any, nor has she established an overwhelming disparity in qualifications between her and

Mr. Taylor. <u>Jaramillo</u>, 427 F.3d at 1309. This leaves the basis of Plaintiff's pretext argument as the subjectivity of Mr. Macaluso's decision, which is not enough to prove pretext. <u>See also</u> infra pp. 20-21. While it is true that courts view subjective evaluations with skepticism, "the existence of subjective criteria alone is not considered evidence of pretext." <u>Riggs v. AirTran Airways, Inc.</u>, 497 F.3d 1108, 1120 (10th Cir. 2007); <u>Plotke v. White</u>, 405 F.3d 1092, 1106 (10th Cir. 2005). Construing all facts in favor of Plaintiff, she has neither sufficiently established pretext nor disputed material issues of fact to survive summary judgment. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's failure-to-promote claim regarding Mr. Taylor's 2008 promotion is granted.

### 2. *Wrongful Termination*

To establish a prima facie case of discrimination resulting in wrongful discharge, a plaintiff must show four elements: (1) that she was a member of a protected class; (2) that she was qualified for the position; (3) that she was terminated despite her qualifications; and (4) that the job was not eliminated after her discharge. <u>Baca</u>, 398 F.3d at 1216. The fourth prong of a plaintiff's prima facie case for wrongful termination varies considering the circumstance. <u>See</u> <u>Kendrick</u>, 220 F.3d at 1229 (finding that "the articulation of the plaintiff's prima facie test might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged"); <u>Plotke</u>, 405 F.3d at 1100 ("Indeed, where an employer contends the actual reason for termination in a discriminatory firing case is not elimination of the employee's position but, rather, unsatisfactory conduct, the status of the employee's former position after his or her termination is irrelevant.").

Here, Defendant concedes that the first three elements are met: Plaintiff belongs to a protected class, she was qualified for her job, and she was terminated. Defendant claims that Plaintiff's duties were absorbed by employees within the department and, therefore, Plaintiff's position was effectively terminated. (Def.'s Br., Dkt. No. 71, at 24-25.) This argument is not persuasive. Defendant states that Plaintiff was fired because she failed to adequately perform her work duties, not because it was eliminating Plaintiff's position. Additionally, the deposition testimony of Mr. Losacco, which Defendant relies on as support that Plaintiff's position was terminated, is unclear. See id. Ex. 18, p. 129, ll. 6-11 ("Q[:] Now, the position that became vacant—and I'm not talking about by title; I'm just saying a spot within the insights team, that was held by Ms. Tran—has still not been filled; is that correct? A[:] That is correct."). Considering that all facts must be construed in favor of Plaintiff and that the prima facie standard is not "onerous," the Court finds that Plaintiff has sufficiently established the prima facie elements to continue analyzing Plaintiff's claim under the McDonnell Douglas standard.

Defendant's proffered legitimate, nondiscriminatory reasons for firing Plaintiff include the following: Plaintiff's ineffective communication with upper management; her lack of performance improvement following the "My Hope" memo and PIP; and her failure to timely deliver a report that Mr. Taylor needed to present to upper management the following day. See supra pp. 3-6. Defendant has offered sufficient reasons to satisfy its burden, which shifts the burden back to Plaintiff to "demonstrate that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged

15

action is pretextual—i.e. unworthy of belief.'" Jones v. Denver Post Corp., 203 F.3d 748, 756 (10th Cir. 2000) (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)). "'[A]s a general rule, an employee must proffer evidence that shows each of the employer's justifications are pretextual.'"[2] Jaramillo, 427 F.3d at 1309-10 (quoting Tyler v. Re/Max Mountain States, 232 F.3d 808, 814 (10th Cir. 2000)). One method a plaintiff may use to raise an inference of discrimination is to show that she was treated differently than similarly situated employees. Pretext may also be established under a subordinate bias theory where a plaintiff must establish a genuine issue of material fact as to the subordinate's bias and a genuine issue of material fact as to the causal connection between that subordinate's bias and

---

[2] A plaintiff does not always have to disprove every proffered reason for termination. The following are examples of when a plaintiff may not have to disprove all proffered reasons to survive summary judgment: (1) when the proffered reasons are "so intertwined that a showing of pretext as to one raises a genuine question whether the remaining reason is valid;" (2) when one explanation is especially "'fishy and suspicious'" so that it lacks credibility; (3) when the plaintiff raises a substantial doubt as to many of the employer's reasons; (4) when the plaintiff discredits the objective reasons leaving only subjective proffered reasons; or (5) when the employer has changed reasons for the plaintiff's termination, raising doubt as to the employer's honesty. Jaramillo, 427 F.3d at 1310.

the employment action, here termination, to survive summary judgment.[3]  EEOC v. BCI

Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 488 (10th Cir. 2006).

As evidence of pretext, Plaintiff raises the following several arguments that she

contends, individually and collectively, demonstrate the pretextual nature of Defendant's

reasons:  (1) alleged discriminatory comments regarding a dislike of working with

"aggressive" or "rough" women that her supervisor, Mr. Taylor, made during the course of

her employment with Sonic, as well as alleged comments referencing Plaintiff's accent;

(2) the "sudden drop" in Plaintiff's performance reviews; (3) the vagueness of Mr. Taylor's

complaints and recommendations regarding respect and attitude; (4) the lack of citation to

specific instances of misconduct in either the "My Hope" memo or the PIP; (5) ad hoc

reasons for termination—such as the ineffective communication and untimely report, neither

of which, Plaintiff argues, resulted in disciplinary action; and (6) failure to hear Plaintiff's

evidence to refute Mr. Taylor's allegations of her poor performance when she was

terminated.  (Pl.'s Br., Dkt. No. 97, at 14, 31-38.)  Generally, all of these amount to a claim

_____

[3]  When a plaintiff does not argue that the formal decisionmaker is the discriminatory
actor, but rather that a biased subordinate provided information and recommended the plaintiff's
termination, the plaintiff must establish both the subordinate's bias and that the decisionmaker
followed the biased recommendation without independently investigating the complaint against
the employee. Shabestari v. Utah Non-Profit Housing, 377 F. App'x 770, 773 (10th Cir. 2010)
(discussing the subordinate bias theory of establishing discrimination).  "[T]he allegedly biased
subordinate accomplishes his discriminatory goals by misusing the authority granted to him by
the employer—for example, the authority to monitor performance, report disciplinary
infractions, and recommend employment actions." BCI Coca-Cola, 450 F.3d at 485.  Here, the
parties do not dispute that Plaintiff was terminated due to the recommendations and reports of
her performance by Mr. Taylor, and Plaintiff does not assert that Mr. Losacco, the final
decisionmaker, was discriminatory.  See infra pp. 20-21.

that Mr. Taylor's actions stem not from Plaintiff's poor work performance, but rather from his animus towards her due to her race, gender, or national origin.  (Id. at 32-34, 36.)  Each will now be considered in turn.

### a.  Discriminatory Comments

Plaintiff claims that two remarks allegedly made by Mr. Taylor stating his preference not to work with "aggressive women" and a comment about the difficulty of understanding Plaintiff's accent prove Mr. Taylor's bias.  Specifically, Plaintiff claims that Mr. Taylor told her that she was "hard to understand," which Plaintiff interpreted as referring to her accent. (Id. Ex. 6, p. 60 l. 24-p. 61 l. 7 (Q[:] Did [Mr. Taylor] ever comment on your accent . . . ? A[:] He said I was hard to understand, referring to my—I take it, at that time, as talking about my . . . my accent.")).[4]

Isolated comments are insufficient to establish pretext unless those comments can be "somehow tied" to Plaintiff's termination.  Stewart v. Adolph Coors Co., 217 F.3d 1285, 1289 (10th Cir. 2000).  Plaintiff attempts to "tie" those comments with her termination by arguing that Mr. Taylor's assessment and recommendations regarding her work performance were the result of Mr. Taylor's discriminatory animus towards her.  Plaintiff cites BCI Coca-Cola, 450 F.3d at 489, as support for her argument, but fails to distinguish a marked

_____

[4]  After the meeting with upper management, Plaintiff claims that Mr. Taylor told her not to speak at future meetings with management unless specifically asked a question. (Pl.'s Br., Dkt. No. 97, at 34.) Plaintiff claims this comment, which Mr. Taylor disputes making, establishes Mr. Taylor's bias.  However, even if Mr. Taylor made the comment, it could just as easily be construed as a concern to prevent the same "ineffective communication" from occurring in future meetings with upper management, as a reflection of bias on Mr. Taylor's part to keep Plaintiff in a subordinate position.

difference between that case and the present one: In <u>BCI</u>, the plaintiff presented two different witnesses testifying that the discriminator made "many race-based remarks," racial jokes, put-downs, and possibly used a racial epithet, as well as three affiants providing specific examples of his disparate treatment of black and Hispanic merchandisers. <u>Id.</u> (noting that "[t]hese comments may have been infrequent, but they certainly were not 'isolated': they were directed at other black merchandisers under [the discriminator's] supervision, suggesting a pattern of racial bias in disciplinary matters that could have affected [the discriminator's] conduct with respect to [the employee's] termination . . . .").

Here, Plaintiff offers only her own testimony that these comments were made and no further evidence of either Mr. Taylor's bias or disparate treatment based on discrimination. These alleged comments are isolated incidents, which even when viewed in a light most favorable to Plaintiff, are not sufficient to evidence Mr. Taylor's alleged bias or that Defendant's proffered reasons for terminating Plaintiff were pretextual.

### b. *Sudden Drop in Performance Review*

Plaintiff next claims that the "sudden drop" in her performance reviews, from August of 2008 which gave her a "Premi-Yum" rating, to the lower evaluations in the 360 review, indicate pretext.[5] Looking at these reviews, the 360 review indicates a difference between

---

[5] Defendant claims peer evaluations may not be used when determining pretext, citing <u>Matthews v. Euronet Worldwide, Inc.</u>, 271 F. App'x 770 (10th Cir. 2008), as support. In <u>Matthews</u>, the court did not consider the plaintiff's co-worker's opinion as to the "excessiveness" of plaintiff's phone ringing, citing both <u>Kendrick</u>, 220 F.3d at 1231, and <u>Furr v. Seagate Tech., Inc.</u>, 82 F.3d 980, 988 (10th Cir. 1996). <u>Id.</u> at 777. However, the <u>Kendrick</u> citation simply refers to a court's duty to evaluate pretext by looking at the facts known to the employer, and the <u>Furr</u> partial citation states that "[i]t is the manager's perception of the

the reviews given by peers and reviews given by managers; this difference does not indicate pretext, however. A superior's opinion of an employee arises from a different perspective than a peer's perspective, and evaluations by the two may place value on different aspects of the employee's work. One raised reason for firing Plaintiff, if not the main reason, was Plaintiff's attitude towards her superiors, which supports the differing evaluations. Additionally, Mr. Taylor was not the only manager who gave Plaintiff a low rating; Mr. Macaluso gave Plaintiff her lowest rating, but Plaintiff does not accuse Mr. Macaluso of being biased.[6] (Pl.'s Br., Dkt. No. 97 Ex. 6, p. 34 l. 16-35 l. 11 ("Q[:] [T]hese questions I'm about to ask you [Plaintiff] [regard] this group of folks: . . . Paul Macaluso . . . [D]id you ever hear any of them make any comments that were racist? A[:] No. Q[:] Did you ever hear any of them make any comments that reflected a racial bias by any of them? A[:] No. Q[:] Did you ever hear any of those folks say anything that was sexist? A[:] No. Q[:] Did you ever hear any of those folks say anything that reflected a gender bias on their part? A[:] No.")).

---

employee's performance that is relevant," which in Furr continues by stating, "not plaintiff's subjective evaluation of his own relative performance." Furr, 82 F.3d at 988. Accordingly, Defendant's claim that Plaintiff's peer evaluations may not be considered is unpersuasive.

[6] Plaintiff received a rating of 2.6 or lower from the following employees: Paul Macaluso, who gave Plaintiff a rating of 1.4; Trey Taylor, who gave Plaintiff a rating of 2.2; Dominic Losacco, who gave Plaintiff a rating of 2; and Tarr, who gave Plaintiff a rating of 2.6. (Def.'s Br., Dkt. No. 71 Ex. 20.) Plaintiff's two highest scores, out of both peer and manager evaluations, were from herself, 4.6, and Sandip, 5. Id. The rating ranges from 1, which means low effectiveness, to 5, which means highly effective.

Plaintiff does argue that Mr. Taylor influenced his co-managers' decisions regarding their evaluations by making statements about Plaintiff's poor performance. Plaintiff argues that these four low evaluations were the result of Mr. Taylor's bias and attempts to persuade other managers that her performance was poor. Mr. Taylor admits discussing with his co-managers all his subordinate employees, including Plaintiff, as did they with him, at weekly manager meetings. (Pl.'s Br., Dkt. No. 97 Ex. 5, at 308-11.) However, any difference between Mr. Taylor's and Mr. Macaluso's evaluations and the higher peer evaluations is still consistent with Defendant's basis for termination, namely, Plaintiff's attitude and lack of respect shown to her superiors within the company, including Mr. Taylor, who Plaintiff believed was unqualified to be her boss. (Def.'s Br., Dkt. No. 71 Ex. 5, at 57 (Plaintiff described Mr. Taylor as not knowing the job to which he was promoted and when she was asked, "in your view, [Mr. Taylor] . . . was not qualified for the job . . . ?" Plaintiff answered yes)).

Plaintiff's belief that Mr. Taylor was unqualified to be her supervisor parallels Defendant's proffered reasons for her termination; someone who did not think her superior was qualified for the job may not display the same level of respect she would towards a superior who she believed was qualified. The timing of the "sudden drop" also substantiates Defendant's proffered reason for her termination: Mr. Taylor became Plaintiff's new supervisor immediately following the period reviewed in her "Premi-Yum" evaluation. While all inferences must be drawn in Plaintiff's favor, her mere assertion that her employer's

explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.

### c. Vagueness and Subjectivity of Complaints and Recommendations

Plaintiff claims that Mr. Taylor's criticisms and recommendations regarding Plaintiff's performance were wholly subjective and too vague to follow, which, Plaintiff argues, creates an inference that the complaints were a pretext for his bias. (Pl.'s Br., Dkt. No. 97, at 36.) Again, Plaintiff cites the Garrett case as support for finding pretext based on subjectivity of review.[7] See supra pp. 13-14. Here, however, there is more than just Mr. Taylor's subjective evaluation of Plaintiff's performance: another manager observed Plaintiff's conduct in the meeting with upper management and was concerned enough to mention in an e-mail to the CEO that it was being addressed, as well as other managers' low performance evaluations given to Plaintiff in the 360 review. Plaintiff's argument that Mr. Taylor's evaluation of her performance was entirely subjective is not sufficient to establish pretext.

### d. Citation to Specific Instances of Poor Performance

Plaintiff continuously asserts that Defendant failed to cite specific instances where Plaintiff performed poorly, specifically regarding the timeliness issue and the interruptions of upper management. Plaintiff claims the lack of disciplinary action as to these specific instances evidences Defendant's exaggeration of the impropriety of Plaintiff's actions.

---

[7] Plaintiff additionally cites two Eleventh Circuit cases, Chapman v. AI Transport, 229 F.3d 1012, 1045-46 (11th Cir. 2000) (en banc) (Birch, J., concurring and dissenting), and Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1500 (11th Cir. 1985), as support for this proposition.

Contrary to Plaintiff's interpretation, however, Defendant did record Plaintiff's conduct in e-mails first apologizing for Plaintiff's behavior and then in e-mails regarding how to prevent such events from happening again.[8]  Additionally, disciplinary action was taken against Plaintiff in the form of the January PIP, which was documented and shown to Plaintiff.  In the PIP, one area of cited improvement concerned Plaintiff's "respect and attitude when meeting with Senior Management and to your support of team decisions and direction." (Pl.'s Br., Dkt. No. 97 Ex. 22.)  Additionally, "timely project follow-up" was listed as an area of improvement.  (Id.)  The "My Hope" memo given to Plaintiff prior to her placement on the PIP, stated areas of "opportunities"—or areas an employee could or needs to improve—as "follow-up on projects," "understand people's roles," and "[senior] management interaction."  (Def.'s Br., Dkt. No. 71 Ex. 15.)  Listed as a "concern" in this memo, Mr. Taylor expressed that he "[felt] as though you might not respect me or many of your peers[.  I] think this limits our teamwork and success."  (Id.)

Plaintiff does not dispute that these events occurred, but she does dispute whether these incidents were significant enough to cause, in part, her termination.  Besides generic and conclusory statements that others would not be terminated for such events and pointing

---

[8] In an e-mail to the CEO regarding the meeting with Plaintiff, Mr. Macaluso stated the following:  "In addition, I would be remiss if I didn't mention that Trey and I have already connected about what we thought was ineffective interaction on the part of Thuc.  We have plans to meet with her next week to provide her with the appropriate coaching."  (Def.'s Br., Dkt. No. 71 Ex. 13.)

to previous "ineffective" comments relating to Mr. Taylor's reviews,[9] Plaintiff does not set out how she was treated differently than similarly situated nonminority employees. See Jones v. Denver Post Corp., 203 F.3d at 756 (finding plaintiff's evidence of disparate treatment failed to survive summary judgment and citing Rule 56 as requiring more than "mere allegations"). In fact, another employee, a white male who also received the "Premi-Yum" rating in his October 2008 review, was also placed on a PIP and terminated during the same period Plaintiff was terminated. (Def.'s Br., Dkt. No. 104, at 4.)

Plaintiff also states that incidents of untimeliness were not reported or expressed to her as an issue she needed to remedy. However, in Mr. Taylor's e-mail to Defendant's human resources vice president describing his recommendation for Plaintiff's termination, which occurred three days after May promo incident, Mr. Taylor states as one of the reasons for Plaintiff's termination her failure to timely produce work. (Def.'s Br., Dkt. No. 71 Ex. 26.) Additionally, the e-mails referencing the upper management meetings document and support managements' concern associated with this meeting; while Defendant did not immediately take disciplinary action after the meeting with upper management, it did so soon thereafter in the form of the PIP. Consequently, Plaintiff has not sufficiently shown that

---

[9] Plaintiff claims that Mr. Taylor was counseled numerous times as needing improvement in his communication skills; these comparisons, however, are not in the same context. Plaintiff cites feedback from Mr. Taylor's performance review citing specific examples of methods of improvement, such as "[b]e sure to show ways to make this information relevant to the average operator," and "[o]ne area of focus for Trey is to get his recommendations and strategic thoughts more concise." (Pl.'s Br., Dkt. No. 97 Ex. 35.) Plaintiff's referenced ineffective communication was raised in the context of a meeting with the CEO, which caused him to become so frustrated he turned around in his chair, and in a disciplinary Performance Improvement Plan, not in her general performance reviews.

Defendant's proffered reasons for termination were pretextual on the basis of a lack of documentation to specific events of Plaintiff's poor performance.

*e. Failure to Hear Plaintiff's Evidence*

Plaintiff's final attempt to establish pretext is based on Defendant's alleged failure to independently investigate the events leading up to Plaintiff's termination and Defendant's failure to give Plaintiff an opportunity to refute the reasons for her termination. Plaintiff contends she did not know she was going to be terminated and was not given adequate time in which to respond to her termination; however, the reasons for Plaintiff's termination—"ineffective" communication, respecting superiors, and timeliness—were all issues raised in the "My Hope" memo and her PIP.

While it is true that "[a]n employer can avoid liability by conducting an independent investigation of the allegations against an employee," this is so in the context after a plaintiff has shown both that the subordinate employee was biased and that the biased subordinate's recommendations caused the plaintiff's termination, which Plaintiff has not done. BCI Coca-Cola, 450 F.3d at 484. Accordingly, Plaintiff's final argument that Defendant's reasons for her termination were pretextual is unpersuasive.

## IV. CONCLUSION

Even when viewing the evidence in a light most favorable to Plaintiff, the Court cannot find that Plaintiff has raised a genuine issue of material fact that either the promotion of Trey Taylor or Plaintiff's termination were motivated by unlawful discrimination or that the reasons proffered by Defendant for these actions were pretextual. See Brankson v. Price

River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) ("[P]laintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."). Additionally, the Court declines to exercise supplemental jurisdiction over any surviving state-law claims Plaintiff asserts. 28 U.S.C. § 1367(c).

Accordingly, Defendant's Motion for Summary Judgment (Dkt. No. 71) is herein GRANTED.[10] All remaining pending motions are stricken as moot.

IT IS SO ORDERED this 8th day of February, 2011.

_____
ROBIN J. CAUTHRON
United States District Judge

---

[10] Defendant also filed a Motion to Strike the Sham Affidavit of Thuc Tran (Dkt. No. 102). After reviewing Plaintiff's affidavit and finding that nothing in it influences the Court's current decision, Defendant's pending motion is now moot. Likewise, Plaintiff's Application to Amend Her Exhibit List (Dkt. No. 103) is moot.